Argued and submitted May 28, 1993, convictions affirmed and remanded for entry of corrected judgment with instructions May 11, petition for review denied August 23, 1994 (319 Or 625)

# STATE OF OREGON,
*Respondent,*

*v.*

# BRUCE LINCOLN BUTTERFIELD,
*Appellant.*

## (C90-0869CR; CA A72432)

874 P2d 1339

David E. Groom, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor

General, and Jonathan H. Fussner, Assistant Attorney General.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

ROSSMAN, P. J.

Leeson, J., concurring in part; dissenting in part.

## ROSSMAN, P. J.

Defendant appeals his conviction and sentence for murder by abuse, ORS 163.115(1)(c),[1] and his conviction for criminal nonsupport, ORS 163.555. We remand for resentencing on the murder by abuse conviction and otherwise affirm.

On appeal from a conviction, we review the facts in the light most favorable to the state. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). The victim, a child, was born on December 29, 1987, to a cocaine dependent mother who released her for adoption. On March 11, 1988, she was placed in the foster care of Bev Basaraba. At first, the child was irritable and jittery, but in Basaraba's care she overcame those problems. She ate and slept well, grew at a normal rate, became developmentally advanced in several ways and normal in all others, and was very social. Basaraba introduced the child to defendant's wife, Sarita Gonzalez, who was a pediatric nurse. Thereafter, Gonzalez and defendant initiated adoption proceedings. They took custody of the child in October, 1989.

Later that month, Gonzalez told a friend that the child was depressed and had staring spells that would last up to ten minutes. The friend thought that the staring spells might be caused by *petit mal* seizures, and recommended that the child be seen by a physician. During November and December, the child reverted to using diapers and a baby bottle, which she had previously outgrown, and her personality ceased to be outgoing. Between December 14 and 31, several people observed the child with bruises and swelling on her face and head. Defendant and Gonzalez usually explained that the child had been having seizures that caused her to fall and hit her head.

---

[1] ORS 163.115 provides, in part:

"(1) Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"* * * * *

"(c) By abuse when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age or a dependent person, as defined in ORS 163.205, and the person has previously engaged in a pattern or practice of assault or torture of the victim or another child under 14 years of age or a dependent person."

On January 2, 1990, Gonzalez called Dr. Schunk, who made an appointment to see the child later that day. At that appointment, Gonzalez told Schunk that the child had suffered a three- to five-minute seizure immediately before she called him. She said that the child had suffered staring spells and, perhaps, *petit mal* seizures over the past several weeks. She also said that the bruises on the child's forehead were caused by an unwitnessed fall on December 30. The child weighed four pounds less than she had weighed three months earlier when she was placed in the care of defendant and Gonzalez. Schunk diagnosed a progressive seizure disorder, prescribed anti-seizure medication and ordered further tests, which revealed nothing of note.

On Sunday, January 7, defendant called Schunk to report that the child had suffered another seizure. Schunk told defendant to bring the child in the next day. On January 8, when he examined her, Schunk noted that the bruises around her eyes were improving. He considered whether the injuries were caused by child abuse, but ruled that out, in part because he knew Gonzalez was a pediatric nurse. He scheduled the child for a magnetic resonance imaging (MRI) test on January 12 to help diagnose her neurological problems. Schunk phoned defendant and Gonzalez on January 9 and 10, and they reported that the child was playing normally. On January 10, defendant expressed frustration to a friend about the child refusing to answer him when he asked her questions. Defendant also told the friend that he believed the child did things to annoy him, to "get [my] goat." In addition, he said that he felt frustrated about her toilet training problems. At trial, he admitted that on January 10 he had slapped the child's abdomen without "good explanation." Defendant was the primary disciplinarian and used spanking as one form of punishment.

During the early morning of January 11, defendant was up several times with the child. At 8 a.m., defendant called Gonzalez to the child's room, because he was not sure whether the child was breathing. Gonzalez tried to revive her. When Gonzalez could not restore the child's pulse and breathing, she called paramedics. They, too, tried unsuccessfully to revive her. Two of the paramedics observed that defendant was "very cold, very calm, and * * * basically

unemotional" following the unsuccessful resuscitation attempts. The paramedics noticed a handprint on the child's abdomen.

Later that day, Dr. Wilson performed an autopsy that revealed two subdural hemorrhages,[2] a "patterned injury" to the child's abdomen, an injury to her buttocks, and numerous subgaleal hemorrhages.[3] Although he could not pinpoint the exact number of subgaleal hemorrhages the child had sustained, he estimated that she was "hit many times over * * * time," possibly numbering in the hundreds. Dr. Brady, defendant's expert, testified that the child's head injuries resulted from "quite a number" of blows that had been inflicted at different times. After viewing the autopsy photographs of the child, Deborah Dyer, the charge nurse at the Pediatric Ambulatory Care Outpatient Clinic at the Oregon Health Sciences Center, concluded that the child had sustained "several" injuries that were inflicted at separate and distinct times.

Defendant was indicted for murder by abuse and for criminal nonsupport. The indictment for murder by abuse alleged that defendant

"did unlawfully and recklessly under circumstances manifesting extreme indifference to the value of human life, cause the death of [the child], a child under 14 years of age, by hitting and striking and restraining the said child on the head, abdomen and buttocks; said [defendant] having previously engaged in a pattern and practice of assault and torture of [the child]."

Defendant demurred to that indictment on the ground that the murder by abuse statute is vague in several particulars. The trial court overruled the demurrer.

At trial, Wilson testified that one of the subdural hemorrhages was caused by an injury that occurred within hours of the child's death, and that the other was caused by an injury that occurred one or two weeks before. He testified that

---

[2] A subdural hemorrhage is an accumulation of blood beneath the dura membrane surrounding the brain and is caused by the tearing of the blood vessels between the brain and the dura.

[3] A subgaleal hemorrhage is the accumulation of blood beneath the galea membrane, which is the deep layer of the scalp that sits on top of the skull.

those injuries were caused by moderate to severe forces, and that an ordinary household fall could not cause them. He explained that the subdural hemorrhages could have caused the child's seizures, but that the seizures could not have caused the subdural hemorrhages. He also noted that the "patterned injury" to child's abdomen was caused by a moderate to severe force, and that he saw that sort of injury only on an abused child. He estimated that that injury occurred between four and eight hours before the child's death and that the injury to her buttocks occurred about two hours before her death. The degree of force necessary to cause the injury to the buttocks was more than a normal spanking. Wilson opined that the subgaleal hemorrhages were caused by hair pulling and that the subdural hemorrhages were caused by battering. His final diagnosis was that the child had died as the result of traumatic head injuries.

Dr. Bays, a pediatrician specializing in the diagnosis and treatment of child physical and sexual abuse, testified that the wounds to the child's buttocks and abdomen were caused by a significant degree of force. She further stated that child's subdural hemorrhages were caused by "multiple episodes of impact to her head" and that accidental falls did not adequately explain the severity of the injuries. She noted that one research study

> "looked at 246 children under the age of five who fell off beds or off of changing tables onto uncarpeted floors. None of them had bleeds into their brain. None of them had any neurologic problems at all."

Bays also pointed to another study that had evaluated 94 children who had sustained subdural hemorrhages and had found that "all [of the subdural bleeds] were due to child abuse[,] except one which was due to an unrestrained motor vehicle accident." All of the medical experts, including defendant's expert, Brady, agreed that the child had been physically abused numerous times over a period of weeks. The jury found defendant guilty of both murder by abuse and criminal nonsupport, and judgment was entered on the verdicts.[4]

---

[4] Gonzalez was similarly indicted, and her case was consolidated with defendant's for trial. Gonzalez was acquitted of murder by abuse, and convicted of criminal nonsupport.

Defendant first contends that the trial court erred in denying his demurrer to the indictment for murder by abuse. He argues that "reckless," as used in the phrase "recklessly under circumstances manifesting extreme indifference to the value of human life," and the phrase "pattern or practice of assault or torture" are vague *on their face*[5] and that, consequently, ORS 163.115(1)(c) is "void for vagueness" under Article I, sections 20 and 21, of the Oregon Constitution, and the Fourteenth Amendment to the United States Constitution. By asserting only a facial challenge to the statute, defendant has improperly advanced his vagueness argument on this appeal. It is well settled, under both the state and federal constitutions, that, unless the exercise of First Amendment liberties is impaired, vagueness challenges are reviewed solely to determine whether application of the contested statute to the defendant's conduct violates the "void for vagueness" doctrine. In *Maynard v. Cartwright*, 486 US 356, 361, 108 S Ct 1853, 100 L Ed 2d 372 (1988), the United States Supreme Court said:

> "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis. *United States v. Powell*, 423 U.S. 87, 92-93, 96 S.Ct. 316, 319-20, 46 L.Ed.2d 228 (1975); *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975); *Palmer v. City of Euclid*, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971) (per curiam); *United States v. National Dairy Corp.*, 372 U.S. 29, 32-33, 36, 83 S.Ct. 594, 597-598, 599-600, 9 L.Ed.2d 561 (1963)."

We echoed those sentiments in *State v. Albee*, 118 Or App 212, 216, 847 P2d 858 (1993):

> " 'Where the statute at issue purports to regulate or proscribe First Amendment rights, courts have allowed defendants to challenge the statute as vague and overbroad as it applies to others. *However, where, as here, First Amendment rights are not affected, the defendant must show the statute is unconstitutional as applied to him.*' " *Quoting State v.*

---

[5] In this context, defendant's facial attack is a claim that ORS 163.115(1)(c) "is 'invalid *in toto* — and therefore incapable of any valid application.' " *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 US 489, 494 n 5, 102 S Ct 1186, 71 L Ed 2d 362 (1982), *quoting Steffel v. Thompson*, 415 US 452, 474, 94 S Ct 1209, 39 L Ed 2d 505 (1974).

*Drummond*, 6 Or App 558, 562, 489 P2d 958 (1971). (Emphasis supplied; citations and footnotes omitted.)[6]

*See also State v. Paige*, 55 Or App 519, 521-22, 638 P2d 1173, *rev'd on other grounds* 293 Or 453, 649 P2d 569 (1982).

**3.** As in *Albee*, the statute at issue in this case does not implicate First Amendment rights. The focus, therefore, should be "on whether the statute is constitutional as applied to defendant under these circumstances." 118 Or App at 216. Accordingly, defendant cannot rely on hypothetical situations at the periphery of the statute in asserting his vagueness challenge, but must instead demonstrate that he was unable to determine from a reading of ORS 163.115(1)(c) that *his* conduct was prohibited. *See State v. Reichsfeld*, 118 Or App 592, 595-96, 848 P2d 639 (1993); *State v. Albee, supra*, 118 Or App at 216; *State v. Paige, supra*, 55 Or App at 521-22. However, defendant's vagueness attack on ORS 163.115-(1)(c) is based solely in the abstract. He makes no attempt to show that application of ORS 163.115(1)(c) to his conduct in this case violates the "void for vagueness" doctrine. That the statute may be vague as applied to other individuals in other contexts is of no assistance to defendant in this case. The demurrer was properly denied.[7]

**4.** Defendant next argues that the trial court erred in denying his motion for judgments of acquittal on both

---

[6] A defendant may raise a vagueness challenge as applied to others when the law at issue purports to regulate First Amendment freedoms, because vagueness in such a law "may itself deter constitutionally protected and socially desirable conduct." *United States v. National Dairy Corp., supra*, 372 US at 36.

[7] The dissent would sustain defendant's demurrer on the ground that ORS 163.115(1)(c) is impermissibly vague on its face. However, by addressing defendant's facial challenge to the statute and completely ignoring the circumstances of this case, the dissent disregards the clear directives in *Maynard, Paige* and *Albee* that defendant's vagueness attack must be reviewed *solely* on an "as applied" basis, *i.e.*, defendant must show that the statute is vague *as applied to him under these particular facts*. Under both federal and state law, it is well settled that our function in this case is to evaluate the constitutionality of ORS 163.115(1)(c) *in light of the facts of the case at hand*. Thus, defendant cannot succeed on his constitutional challenge unless he establishes that he was unable to determine from ORS 163.115(1)(c) that *his* conduct would expose him to criminal sanctions. Neither defendant nor the dissent makes even a passing reference to defendant's actions in this case. Although the dissent has joined defendant in his attempt to circumvent the requirement that he establish that ORS 163.115(1)(c) is impermissibly vague as applied to his actions, we do not.

charges. He first contends that there was insufficient evidence to convict him of murder by abuse. As shown by the recitation of facts, the evidence was sufficient.

**5.** With regard to his conviction for criminal nonsupport under ORS 163.555, defendant asserts that the state failed to prove that he engaged in conduct that falls within the ambit of the statute's prohibition. The state's theory at trial was that defendant failed, without lawful excuse, to provide the child with necessary and proper medical attention. Defendant maintains that that theory cannot properly serve as the basis for a conviction of criminal nonsupport, because the statute only punishes a parent or other responsible person who fails to meet his or her financial obligations to a dependent child.

**6.** The primary difficulty with defendant's position is that it is directly at odds with the plain and unambiguous language of the nonsupport statute. In construing a statute to divine the intent of the legislature, we first examine the text of the statute "to ascertain 'what is * * * contained therein, not to insert what has been omitted, or to omit what has been inserted.' " *State v. Trenary*, 316 Or 172, 175, 850 P2d 356 (1993), *quoting* ORS 174.010. We also look to the statute's context, which involves an examination of other provisions of the statute. *State v. Person*, 316 Or 585, 590, 853 P2d 813 (1993); *State v. Trenary, supra*, 316 Or at 175. Examination of the nonsupport statute's text and context unquestionably reveals a legislative intent to include within the statute's purview the inexcusable failure of a parent or other provider to furnish necessary medical attention to a dependent child. ORS 163.555 provides, in part:

> "(1) A person commits the crime of criminal nonsupport if, being the parent, lawful guardian or other person lawfully charged with the *support* of a child under 18 years of age, * * * the person refuses or neglects without lawful excuse to provide *support* for such child." (Emphasis supplied.)

The term "support" is defined at ORS 163.505(2):

> " 'Support' includes, but is not limited to, *necessary and proper* shelter, food, clothing, *medical attention* and education." (Emphasis supplied.)

ORS 163.555(2), which specifically addresses the validity of certain defenses to a prosecution under the statute, provides, in part:

"(b) *In a prosecution for failing to provide necessary and proper medical attention*, it is a defense that the medical attention was provided by treatment by prayer through spiritual means alone by adherents of a bona fide religious denomination that relies exclusively on this form of treatment in lieu of medical attention."

**7.** By their terms, ORS 163.555 and ORS 163.505 express the legislature's intent that the nonsupport statute apply to parents who, without lawful excuse, fail to provide essential medical attention for their children.[8] Defendant does not claim that the evidence was insufficient to permit a reasonable juror to find that he failed to furnish the child with necessary and proper medical attention. Accordingly, we conclude that the trial court properly denied defendant's motion for a judgment of acquittal on the charge of criminal nonsupport.

**8.** Defendant also assigns as error the admission of testimony from two of the state's expert witnesses, Bays and Wilson, on the issue of battered child syndrome. Both witnesses testified that one of the classic diagnostic indicators of the syndrome is that the child's caretakers change the explanations for the child's injuries. Defendant argues that that testimony should have been excluded, because it constituted an impermissible comment on the credibility of defendant and Gonzalez, who both testified at trial.

---

[8] If legislative intent cannot be discerned from the statute's text and context, we then look to legislative history. *State v. King*, 316 Or 437, 443, 852 P2d 190 (1993); *State v. Trenary, supra*, 316 Or at 175. Although there is no need to resort to legislative history in this case, it confirms our conclusion. The commentary to ORS 163.505(2) provides:

"Subsection (2) defines 'support' as necessary and proper care and maintenance. Present law, ORS 167.605, lists 'shelter, food, care or clothing' as specific examples of support. *Medical attention* and education have been added as specific areas of support necessarily implied by the term 'care.' *The term 'support' is used in § 175, criminal nonsupport.*" *Proposed Oregon Criminal Code* § 170 (1970). (Emphasis supplied.)

In addition, the commentary to ORS 163.555 specifically notes that it departs from the previous nonsupport statute by broadening "the definition of support by specifically including medical attention and education." *Proposed Oregon Criminal Code* at § 175.

The Supreme Court has held that "a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983); *see also State v. Keller*, 315 Or 273, 284, 844 P2d 195 (1993). In *Middleton*, the court permitted two expert witnesses to testify, after defendant had impeached the victim with her retraction of the allegations, that the victim's conduct was consistent with the "typical response" of a victim of familial child sexual abuse. The Supreme Court concluded that the testimony was not an impermissible comment on the victim's credibility:

> "It is true that if the jurors believed the expert's testimony, they would be more likely to believe the victim's account. Neither of the experts directly expressed an opinion on the truth of the victim's testimony. Much testimony will tend to show that another witness either is or is not telling the truth. This, by itself, will not render evidence inadmissible." 294 Or at 435. (Citations omitted.)

In *State v. Bockorny*, 124 Or App 585, 863 P2d 1296 (1993), *rev den* 318 Or 351 (1994), we recently had occasion to consider whether an expert witness had improperly commented on the truthfulness of another trial witness. In *Bockorny*, the state's expert testified that, in his experience, prison inmates' accounts of their crimes often change the longer they remain incarcerated and that it is both customary and prudent for an expert to make every attempt to verify independently an inmate's story. The defendant argued that that testimony was tantamount to telling the jury that she had lied during an interview with the expert and during her testimony at trial, because the jury knew that she had been in custody for 18 months. We noted that the fact that the testimony may have permitted an inference by the jury that the defendant was not truthful did not render the testimony inadmissible. After quoting from the passage in *Middleton* set out above, we held that the expert's testimony did not constitute a direct comment on the credibility of the defendant and that it was properly admitted.

Here, the testimony of Wilson and Bays was not impermissible. They each stated, in the abstract, that a caretaker's changing explanations of the causes of a child's injuries is a textbook symptom of battered child syndrome.

The fact that the jury could have inferred from their testimony that defendant and Gonzalez were not telling the truth does not render the testimony inadmissible. *State v. Middleton, supra,* 294 Or at 438; *State v. Bockorny, supra,* 124 Or App at 591-92; *State v. Wilson,* 121 Or App 460, 464, 855 P2d 657, *rev den* 318 Or 61 (1993). The critical fact is that neither Wilson nor Bays made direct comments about the credibility of defendant or Gonzalez. The trial court committed no error in admitting their testimony.

 Defendant's remaining assignments of error pertaining to his conviction for murder by abuse do not require discussion. He is correct, however, that the court erred in sentencing him to life in prison pursuant to ORS 163.115-(3)(a). The court should have imposed a judgment for post-prison supervision for the remainder of defendant's life under OAR 253-05-004. Defendant's 15-year minimum term under ORS 163.115(3)(b) and (c) is valid, however. *State v. Morgan,* 316 Or 553, 856 P2d 612 (1993); *State v. Hostetter,* 125 Or App 491, 865 P2d 485 (1993). Defendant need not be present for entry of the corrected judgment. *State v. Bivens,* 127 Or App 83, 871 P2d 486 (1994).

Convictions affirmed; remanded for entry of a corrected judgment with instructions to delete the sentence of imprisonment for life and to impose a judgment under OAR 253-05-004 for post-prison supervision for the remainder of defendant's life.

**LEESON, J.,** concurring in part; dissenting in part.

I disagree with the majority's treatment of the ruling on defendant's demurrer to the indictment for murder by abuse. ORS 163.115(1)(c). In support of his demurrer, defendant argues that the statute is unconstitutionally vague on its face, because it "invites standardless and unequal application of the criminal laws." The majority declines to consider that argument, because it considers defendant to have "improperly advanced his vagueness argument[.]" 128 Or App at 7. I respectfully dissent.

Defendant argues that ORS 163.115(1)(c) is vague under Article I, sections 20 and 21, of the Oregon Constitution, and under the Fourteenth Amendment to the United States Constitution. A facial vagueness challenge should be

upheld, although the challenged statute does not implicate First Amendment rights or constitutionally protected conduct, "if the enactment is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 US 489, 494-95, 102 S Ct 1186, 71 L Ed 2d 362 (1982) (quoted with approval in *State v. Robertson*, 293 Or 402, 411 n 8, 649 P2d 569 (1982)). In *Flipside*, the Court elaborated:

> "[T]o sustain such a challenge, the complainant must prove that the enactment is vague ' "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensive normative standard, but rather in the sense that *no standard of conduct is specified at all.*" * * *.' " 455 US at 495 n 7. (Citations omitted; emphasis supplied.)

The Ninth Circuit applied that formulation in *Schwartzmiller v. Gardner*, 752 F2d 1341, 1347 (9th Cir 1984):

> "[A] party has standing to challenge a statute facially, despite the ordinary rule against facial statutory review, if 'no standard of conduct is specified at all,' *Parker v. Levy*, 417 US [733, 755, 94 S Ct 2547, 41 L Ed 2d 439 (1974)], *quoting Coates* [*v. City of Cincinatti*, 402 US 611, 614, 91 S Ct 1686, 29 L Ed 2d 214 (1971)]; that is, if the statute 'is impermissibly vague in all of its applications.' *Flipside*, 455 US at 497[.]"

Because I believe that defendant has made the argument that ORS 163.115(1)(c) fails to provide a standard of conduct, I would address it.[1]

---

[1] There is no conflict between *Flipside* and *Schwartzmiller* (and the cases cited therein), and the cases upon which the majority relies, including *State v. Reichsfeld*, 118 Or App 592, 595, 848 P2d 639 (1993), and *State v. Albee*, 118 Or App 212, 847 P2d 858, *rev den* 316 Or 528 (1993). In *Reichsfeld* and *Albee*, the defendants do not appear to have argued that the challenged statutes provided no standard of conduct. Cases in which this court and the Supreme Court have addressed facial vagueness challenges to statutes that did not implicate First Amendment rights, include *State v. Farrar*, 309 Or 132, 181-84, 786 P2d 161 (1990) (upholding provisions of an aggravated murder statute *after considering* the defendant's facial vagueness challenge), *State v. Graves*, 299 Or 189, 700 P2d 244 (1985) (striking down a provision of an aggravated burglary statute, apparently on its face), and *State v. Moeller*, 105 Or App 434, 806 P2d 130, *rev den* 312 Or 76, 815 P2d 701 (1991) (sustaining a facial vagueness challenge to a provision that increased the seriousness of cultivation, manufacture or delivery of a controlled substance, if the act was a part of a "scheme or network").

The Supreme Court has recently reviewed the standards for evaluating a contention that a criminal statute is vague under the Oregon Constitution:

" 'The terms of a criminal statute must be sufficiently explicit to inform those who are subject to it of what conduct on their part will render them liable to its penalties.' *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985). A 'reasonable degree of certainty' about what conduct falls within the statute's prohibition is required; absolute certainty is not. *State v. Cornell/Pinnell*, 304 Or 27, 29-30, 741 P2d 501 (1987). In addition to giving fair notice of prohibited conduct, a criminal statute must not be so vague as to allow a judge or jury unbridled discretion to decide what conduct to punish. *Id.* at 29. A law that gives such unbridled discretion to judges and juries offends the principle against *ex post facto* laws embodied in Article I, section 21, of the Oregon Constitution, and the principle against standardless and unequal application of criminal laws embodied in Article I, section 20, of the Oregon Constitution. *State v. Graves, supra*, 299 Or at 195." *State v. Plowman*, 314 Or 157, 160-61, 838 P2d 558 (1992), *cert den* ____ US ____, 113 S Ct 2967, 125 L Ed 2d 666 (1993).

Those standards should not be applied mechanically: The degree of vagueness that is tolerated in a statute varies depending on the particular regulation at issue. For example, more vagueness is tolerated in an economic regulation than in a criminal statute. Also, the degree of vagueness that will be tolerated in a statute varies with the severity of the consequences for its violation. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., supra*, 455 US at 498-99. The consequences for violation of ORS 163.115(1)(c), a criminal murder statute, are unquestionably severe.

The 1989 legislature, which enacted the murder by abuse statute, did not define a "pattern or practice of assault or torture" for purposes of ORS 163.115(1)(c).[2] Because of

---

[2] A somewhat similar phrase is used in the Oregon racketeering statute, which makes it a crime to acquire or maintain an interest in real property through a "pattern of racketeering activity." ORS 166.720(2); *see also* ORS 166.720(3). We upheld that statute against a vagueness challenge, because ORS 166.715(4) provides a specific and detailed definition of what conduct constitutes a "pattern of racketeering activity." *State v. Romig*, 73 Or App 780, 788, 700 P2d 293, *rev den* 299 Or 663 (1985). The state concedes that, "given the particular statutory definition and its 'specialized application to criminal organizations,' RICO cases shed little light on whether the phrase 'pattern or practice' is vague." I agree.

the absence of an applicable statutory definition, it is necessary to determine whether the phrase "a pattern or practice of assault or torture" has a clear and commonly understood meaning.

The state contends that "pattern" and "practice" are synonymous, and that they have a readily understood meaning:

"A pattern is the organized whole that can be seen when otherwise random elements come together in an orderly and interrelated fashion. A pattern of behavior emerges when a person engages in repeated acts that are the same or similar in nature and appear to have some overall connection. 'In * * * a series of events, [a pattern is] an arrangement of parts, elements, or details that suggests a design or orderly distribution.' Webster's New International Dictionary (2d Ed 1941). In psychology, a pattern is '[a] complex whole, characterized by a definite arrangement or interrelation of parts; as, a behavior *pattern.' Id.* (emphasis in original). A practice is 'often, repeated, or customary action; habit; custom; as, the *practice* of rising early or working hard[.]' *Id.* (emphasis in original)."[3]

I agree with the state that those definitions capture the flavor of a "pattern or practice." However, far from clarifying the meaning of the terms, they are illustrative of the quagmire that the legislature created by employing those terms without statutory definition. The definitions demonstrate that a "pattern or practice" is a complex matter consisting of a variety of interrelated parts. A pattern or practice consists of an elusive mixture of factors such as quantity, frequency and similarity of acts.

By making a "pattern or practice" of assault or torture an element of a crime, the 1989 legislature delegated

---

[3] The legislative history of ORS 163.115(1)(c) shows that at that time the Attorney General's office urged the legislature to provide a statutory definition for a "pattern or practice":

"Section 2 of the bill requires prosecutors to prove a pattern or practice of assault or torture * * * in order to obtain a conviction. If the committee keeps that provision, we recommend the committee establish the standards necessary for prosecutors to make such a showing. * * * How many [incidents] must a prosecutor prove to demonstrate a 'pattern or practice?' " Minutes, House Judiciary Committee, Subcommittee on Family Justice, February 7, 1989, Exhibit F (testimony of Deborah A. K. Wilson, Assistant Attorney General, on HB 2033).

to judges and juries responsibility to determine what mixture of factors such as quantity, frequency and similarity of acts constitutes a "pattern or practice" in the circumstances of the given case. The 1989 statute leaves it for the trier of fact to define the elements of the crime—*i.e.*, the elements of a pattern or practice—on the facts presented. It gives each judge and each jury unbridled discretion to decide what conduct to punish. I would hold that ORS 163.115(1)(c) fails to provide a standard of conduct.

Because the statute is vague, it is necessary to determine whether it is possible to provide a "saving construction." *See State v. Cornell/Pinnell*, 304 Or 27, 30, 741 P2d 501 (1987); *State v. Robertson, supra*. In *Robertson*, the court said:

> "When a statute is attacked as vague, for failing to define and communicate its coverage, the statute sometimes can be saved by a judicial interpretation that gives it the required definiteness. It is the court's obligation to do so when this can be done without departing too far from what the legislature sought to accomplish or what the statute itself can convey to a reader. But *when such a saving construction cannot be attributed to the legislature with reasonable fidelity to the legislature's words and apparent intent, the statute is invalid as enacted, and it is immaterial whether the particular case in which it is challenged would be immune from a validly drawn law*." 293 Or at 411. (Emphasis supplied.)

As the state's argument about the meaning of the phrase shows, the commonly understood meaning of a "pattern or practice" encompasses some mixture of a number of episodes of a similar character occurring in some order. In response to its own concerns that the murder by abuse statute was vague, the 1993 legislature provided a statutory definition of a pattern or practice. The amended statute defines the phrase in terms of quantity only: "more than one previous episode."

It is, of course, the prerogative of the legislature to define statutory terms as it pleases. However, we are not at liberty to adopt the new statutory definition as a saving construction in this case. A saving construction faithful to the commonly understood meaning of the term "pattern or practice" would have to be sensitive to the factors discussed

above. It would have to specify a quantity and frequency of acts prohibited by the law, and would have to indicate the respect, if any, in which those acts must be similar. *Cf.* ORS 166.715(4) (defining a "pattern of racketeering activity" as at least two incidents within five years, involving similar intents, results, accomplices, victims, or methods of commission or having other distinguishing characteristics). It is not our province, under the heading of providing a "saving construction," to arbitrarily select the required number and frequency of acts, or their required character, when the legislature has declined to do so. I would conclude that the phrase "pattern or practice" is not amenable to a saving construction.

Because the murder by abuse statute is vague and is not amenable to a saving construction that is faithful to the legislature's words and apparent intent, it cannot support defendant's conviction. I would remand with instructions to enter a judgment of conviction for the lesser included offense of manslaughter in the first degree, if so requested by the state. *See State v. Graves, supra,* 299 Or at 195. I agree with the majority that defendant's conviction for criminal nonsupport should be affirmed.