Argued and submitted September 30, reversed and remanded for a new trial
December 10, 2003

# STATE OF OREGON,
*Respondent,*

*v.*

# HEATHER ANN ROMERO,
*Appellant.*

## 99C41881; A111035

81 P3d 714

Shawn Wiley, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Acting Executive Director, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Leeson, Judge pro tempore.

EDMONDS, P. J.

## EDMONDS, P. J.

Defendant appeals from convictions for two counts of criminal mistreatment under ORS 163.205. At trial, defendant sought to introduce expert testimony that she was more subject to suggestion during police interrogation than an ordinary member of the population in order to support her claim that her confession to police was made involuntarily.[1] The trial court ruled that the evidence amounted to a direct comment on defendant's credibility and therefore excluded it. Defendant assigns error to that ruling and to another ruling that excluded her raw scores on a number of psychological tests.

Defendant provided in-home day care for her two nieces. The state alleges that she assaulted one of her nieces, a six-month-old child, while caring for her. A series of events led to the niece being taken to a hospital emergency room. By the time the niece was examined by a doctor, bruising covered much of her face. One bruise appeared to be an adult-sized handprint. At trial, a medical expert testified that the niece's injuries were caused by multiple blows from an adult sized human hand "within six hours or so" of her examination. That was a time period during which the niece was in defendant's care.

As a result of the hospital examination, the police went to defendant's home. They asked her to accompany them to the police station, and she agreed. During the three-hour interview that followed at the police station, defendant admitted that she had hit the child. She also said, in a tape recorded statement, that the police had not threatened her or made any promises to her that induced her confession, and she agreed with the police that her statement was the product of her free will.

---

[1] In other jurisdictions, similar testimony has been offered in an effort to demonstrate that some police interrogation techniques produce false confessions. *See, e.g., United States v. Hall*, 93 F3d 1337 (7th Cir 1996); *United States v. Shay*, 57 F3d 126 (1st Cir 1995); *Vent v. State*, 67 P3d 661 (Alaska Ct App 2003); *State v. Cobb*, 30 Kan App 2d 544, 43 P3d 855 (Kan App 2002); *State v. Tellier*, 526 A2d 941 (Me 1987); *State v. Davis*, 32 SW3d 603 (Mo Ct App 2000).

At trial, defendant testified before the jury that her confession to the police during the interview at the police station was made involuntarily and was false. She stated that, during the unrecorded portion of the interview period, she was told by the police officers that if she did not tell them that she had hit the child, they would put her in jail and not permit her to see her family. She also testified that she was told that she could go home if she admitted hitting the child. The officers who conducted the interview denied defendant's allegations. Another witness, defendant's nine-year-old son, testified that he was the person who had hit the child after she continued crying, despite his efforts to make her stop. According to the son, he slapped the child multiple times. Defendant also sought to offer the evidence of an expert witness, Dr. Kolbell, who was prepared to testify about defendant's susceptibility to interrogation techniques. It is the exclusion of his testimony from the jury that defendant first assigns as error on appeal.

During the trial, the trial court held a hearing outside the presence of the jury to determine whether to admit Kolbell's testimony into evidence. Kolbell administered a number of psychological tests to defendant. He was prepared to testify that the results of those tests, and particularly those from his administration of the Gudjonsson Suggestibility Scale, indicated that defendant was more susceptible to suggestion in a police interrogation setting than an average member of the population. During the hearing, the following colloquy occurred after Kolbell described the psychological tests that he administered.

"The Court: Let me ask you a question.

"Dr. Kolbell: Sure.

"The Court: 'Voluntariness' means was this of her free will. Would you agree with that?

"Dr. Kolbell: Sure.

"The Court: All right. What of these tests determine whether it was of her own free will or not?

"Dr. Kolbell: Allow me? None of these tests will evaluate whether any specific statement by anybody at any time was clearly and definitively of their own free will. However,

what the scientific literature informs us is that people can make statements that are not voluntary, or they can make voluntary statements, and there are specific kinds of factors that increase their susceptibility or likelihood to not do that. Oh, no, no, no, not a false statement, a voluntary * * * voluntary versus involuntary. Yeah, I can't definitively say whether something was or wasn't voluntary. I can say that here are the factors that are known to correlate with involuntary versus voluntary statements. And that's all that I could—that's all I can say.

"* * * * *

"There are factors like intelligence, like sleep deprivation, memory, mood state, presence of drug and alcohol use, assertiveness—there's a list of them I brought with me—anxiety, physical distress, intention—or need to present as good or, oh, what's the word I'm looking for—need for social approval, coping strategies, self-esteem, sense of where a person's control lies, does it lie within them * * *."

Ultimately, the trial court ruled,

"I'm going to exclude his testimony, not based upon a lack of competence or not based upon the fact that the tests are not good, or that he is not a good clinician. I'm going to do it simply based upon it's a comment on the evidence, it's a comment on the voluntariness, it's a comment on the truth or the falsity of the testimony. And from that standpoint I don't think it's going to come in. * * *

"[Defense counsel]: Is that with respect to each and every one of the tests or just with the Gudjonsson test?

"The Court: That's each and every test."

Defendant subsequently submitted Kolbell's report about the results of the psychological tests as an offer of proof as to what Kolbell would have testified to if the trial court had admitted his testimony. That report stated, in relevant part:

"Ms. Romero was administered the Gudjonsson Suggestibility Scale, which is a standardized and normed instrument developed to evaluate suggestibility during police interrogation. Her responses reflect a tendency to respond affirmatively in situations where she does not know the answer; even when she is clear that she does not

know the answer, when pressed she will provide an incorrect answer regardless. Her performance also demonstrates a pronounced tendency to shift her responses in the face of negative feedback. Essentially, when told by the examiner that some of her responses are inaccurate, she changes several of her responses, even those which she had previously answered correctly. She obtained a total score of 17 on this instrument, which is approximately one standard deviation above the mean for both forensic patients and normal controls, and this suggests significant suggestibility during interrogative questioning.

"Ms. Romero is a generally pleasant, socially conforming, controlled individual with borderline to impaired range intellectual functioning and cognitive abilities. She has difficulty with complex tasks, and does best when she is able to focus on one thing at a time only. She tends to manage her feelings, as well as her external environment, by attempting to maintain order, uniformity, and predictability. Virtually all of her adult experience has been as a mother, and this began at age 16 years old, during a developmental time in which most adolescents are laying the foundation for adult identity. Thus, Ms. Romero has come to identify herself exclusively with the role of being a mother and wife. Her intellectual and cognitive limitations are likely to make it difficult for Ms. Romero to experience a significant success in the competitive workplace, and she is likely to do best in domestic functioning or a fairly simple and repetitive work. Psychologically, she is quite naive, unsophisticated, and tends to maintain a fairly moral view of the world, in keeping with her religious background and faith. She likely finds great comfort in her structured system of moral values, and beliefs, reducing ambiguity and uncertainty. She is fairly simple and concrete in her thinking, and is limited in terms of her ability to form concepts or ideas independently. She may become anxious when challenged intellectually, and doubt her own abilities or accuracy. When faced with real or perceived threat, she may vacillate between fairly rigid and inflexible thinking, and at other times, become quite acquiescent. She is particularly prone to suggestibility during interrogations, particularly when she is anxious, threatened, fatigued, and/or in physical distress.

"There is clear evidence on today's evaluation that Ms. Romero may be quite suggestible during interrogation,

and this is not surprising. The psychological literature indicates that multiple factors identified in Ms. Romero affect suggestibility during interrogation, including memory, intelligence, anxiety, fatigue, and self-esteem. She may be influenced by leading questions, and inclined to shift her answers when challenged and provided negative feedback on her responses. This will increase as her perception of threat increases. Under these circumstances, she may be vulnerable to providing inaccurate statements in an effort to relieve pressure, achieve [ ] safety, and gain approval from those in authority."

■        In Oregon, a witness cannot comment directly on whether another witness is testifying truthfully or whether another witness's prior statement was truthful. *State v. Keller*, 315 Or 273, 284-85, 844 P2d 195 (1993); *State v. Middleton*, 294 Or 427, 437-38, 657 P2d 1215 (1983). When testimony directly comments on a witness's credibility has been the subject of much debate. In *Middleton*, the Supreme Court held that it was not error to admit testimony describing the reaction of the typical child victim of familial sexual abuse and an expert's opinion that the recantation of an initial accusation by the victim was not atypical. *Middleton*, 294 Or at 438. However, in *State v. Milbradt*, 305 Or 621, 756 P2d 620 (1988), the defendant argued that the trial court erroneously allowed a caseworker, who was not an expert on mentally defective adults, to testify about the way child victims ordinarily react to sexual abuse. The Supreme Court, in reversing the defendant's conviction, also questioned the relevance of the witness's testimony and admonished that, in future cases, a proper foundation needed to be established to demonstrate that such scientific evidence was admissible as expert opinion evidence. *Milbradt*, 305 Or at 630. Similarly, in *Keller*, the court held that testimony from a physician that the child complaining witness had not been coached and that she was "obviously telling you about what happened to her body" was an impermissible comment on the child's credibility.[2] 315 Or at 285.

---

[2] The state also relies on *State v. Hiatt*, 303 Or 60, 733 P2d 1373 (1987). However, we believe that the Supreme Court's decision in *Middleton* is more instructive.

This court confronted the same issue in *State v. Remme*, 173 Or App 546, 23 P3d 374 (2001). At issue was the admissibility of several statements of witnesses that offered reasons for the giving of inconsistent reports of abuse by a child sex abuse victim. We explained,

> "the common principle underlying *Middleton, Milbradt,* and *Keller* is that expert testimony must assist, not supplant, the jury's assessment of credibility. The jury's function is not impinged upon when expert testimony does no more than provide jurors with useful, nonconclusive information from which *inferences* as to credibility *may* be drawn."

*Remme*, 173 Or App at 562 (emphasis in original). In concluding that the challenged testimony did comment impermissibly on the victim's credibility, we observed, "[r]ather, the witnesses provide the jury with possible reasons for [the victim's] behavior[.]" *Id.* at 563.

■　　Here, we perceive nothing in Kolbell's testimony that comments directly on defendant's credibility. His oral testimony consisted of describing the tests that he administered to assess defendant's current psychological condition. His written report not only describes those tests but, based on their application to defendant, opines that defendant "may be quite suggestible during interrogation," "may be influenced by leading questions and inclined to shift her answers when challenged and provided negative feedback on her responses," and "may be vulnerable to providing inaccurate statements in an effort to relieve pressure, achieve safety and gain approval from those in authority." None of that testimony would have supplanted the jury's assessment of credibility; rather, it simply would have provided the jury with information or reasons from which it could draw inferences as to credibility regarding defendant's claims that her confession was false.[3]

---

[3] In contrast to the above testimony, we recently held that a witness impermissibly commented on the credibility of another witness when he testified, "I believe it most definitely happened exactly the way the victim described it to me." *State v. Leahy*, 190 Or App 147, 153, 78 P3d 132 (2003). Also, in *State v. McQuisten*, 97 Or App 517, 519 n 2, 776 P2d 1304 (1985), we held inadmissible a police officer's testimony that a witness "showed every sign, every action and everything pretty true and it is pretty hard for someone to fabricate those feelings and those emotions and

■     We now turn to the state's alternative argument that, even if we conclude that the trial court improperly excluded Kolbell's testimony on the ground that it was a comment on defendant's credibility, we must nonetheless affirm because defendant failed to lay an adequate foundation for the admissibility of his assessment of defendant. The issue focusses mainly on the scientific reliability of the Gudjonsson Suggestibility Scale, which was the lynchpin of Kolbell's assessment. Essentially, the state argues that the trial court's exclusion of Kolbell's testimony was correct but for the wrong reason and that we should therefore affirm defendant's convictions. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 660, 20 P3d 180 (2001) (explaining "right for the wrong reason" rationale for affirmance).

■     According to the state, Kolbell's testimony is not admissible because it is based chiefly on the Gudjonsson test, a test that is not scientifically reliable. Evidence is properly considered scientific if it "draws its convincing force from some principle of science, mathematics and the like." *State v. Brown*, 297 Or 404, 407, 687 P2d 751 (1984). "Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by the appropriate scientific validation." *State v. O'Key*, 321 Or 285, 292, 899 P2d 663 (1995). "Whenever a litigant claims that a particular scientific technique or theory is valid, that claim is a hypothesis requiring empirical verification." *Id.* at 292-93.

■     To determine whether scientific evidence is admissible, a trial court must determine whether the offered evidence is relevant under OEC 401, whether the evidence would be of some assistance to the jury in making its determination under OEC 702, and whether the evidence should be excluded under OEC 403. *Brown*, 297 Or at 438. The following seven factors function as guidelines to determine scientific validity:

> "(1)   The technique's general acceptance in the field;
>
> "(2)   *The expert's qualifications and stature;*

_____

she was shockey * * *. She is showing very true emotions and signs * * * you know. These things are very true."

"(3)   The use which has been made of the technique;

"(4)   The potential rate of error;

"(5)   The existence of specialized literature;

"(6)   The novelty of the invention; and

"(7)   The extent to which the technique relies on the subjective interpretation of the expert.

"The existence or nonexistence of these factors may all enter into the court's final decision on admissibility of the novel scientific evidence, but need not necessarily do so. What is important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence under OEC 401 and OEC 702."

*Id.* at 417-18. Thus, "the 'overarching subject' of this multi-factor, 'flexible' inquiry 'is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission.'" *O'Key*, 321 Or at 305 (quoting *Daubert v. Merrell Dow Pharms.*, 509 US 579, 594-95, 113 S Ct 2786, 125 L Ed 2d 469 (1993)).

During the hearing, Kolbell testified as follows:

"[Defendant's counsel]:   Let's deal with the Gudjonsson Suggestibility Survey Test, number five on your list—

"Dr. Kolbell:   Mm-hmm?

"[Defendant's counsel]:   —is that widely used in your field? In your opinion?

"Dr. Kolbell:   It's a difficult question to answer. No, I don't think it's widely used, because it has fairly specific intentions. It's designed for two purposes, basically. And so unless—and these are not purposes that are widely encountered in psychological practice. So the frequency of its use across the country is, relative to the other tests, the frequency of its use is very narrow, or very slight. Within its domain of things that it is sought to evaluate, it's probably fairly widely used. Although I don't—I can't answer that.

"[Defendant's counsel]:   Okay. Well, let me—

"Dr. Kolbell:   I can't quantify how often it's used in—within this specific domain for which it was intended. But I can tell you *it's widely researched, that it's been developed*

*appropriately in terms of the scientific method, that it has been peer reviewed, it has been reviewed on several occasions by others and critiqued and modified and so forth.*

"[Defendant's counsel]: Let me use an analogy. I['m] looking at, say, the first seven tests other than that one—

"Dr. Kolbell: Mm-hmm?

"[Defendant's counsel]: —if I were to suggest it was widely used in the field of psychology, you say yes. If I would say in the medical field, taking vital signs is widely used, would that be comparable in the medical field?

"Dr. Kolbell: Broadly, yes.

"[Defendant's counsel]: Okay. If I were to say taking an x-ray of someone to determine if there was a broken bone would be more narrowly used in the medical field but widely used within that issue—

"Dr. Kolbell: I'd say that's accurate.

"[Defendant's counsel]: —would that be a parallel to the Gudjonsson test?

"Dr. Kolbell: I think so.

"[Defendant's counsel]: So that among the practitioners who are looking at that focus to which the test addresses, would it be fair to—is it fair to say it's widely used or accepted?

"Dr. Kolbell: I don't know.

"[Defendant's counsel]: Okay.

"Dr. Kolbell: I can't answer that."

(Emphasis added.)

Kolbell's testimony also included a discussion of the second *Brown* factor, *i.e.*, his qualifications as an expert:

"[Defendant's counsel]: For the record, sir, what is your current occupation?

"Dr. Kolbell: I am a psychologist.

"[Defendant's counsel]: And are you licensed to practice in the State of Oregon?

"Dr. Kolbell: Yes, I am.

"[Defendant's counsel]:   Do you practice in the State of Oregon?

"Dr. Kolbell:   Yes, I do.

"[Defendant's counsel]:   When were you licensed?

"Dr. Kolbell:   Um—

"[Defendant's counsel]:   In the State of Oregon, if you recall.

"Dr. Kolbell:   1993.

"[Defendant's counsel]:   Could you describe for the court your education and training that you received prior to licensing?

"Dr. Kolbell:   Sure. I have a bachelor's degree in psychology, a master's in psychology, a doctorate in psychology. I was interned at Columbia Presbyterian Medical Center in New York City in clinical neuropsychology. I did a postdoctoral fellowship in clinical neuropsychology and medical psychology, and I have been a regular attender at continuing education classes and trainings, some 25 to 30 hours every year.

"[Defendant's counsel]:   And what is your particular area of practice, currently?

"Dr. Kolbell:   My specialty areas are neuropsychology and forensic psychology.

"[Defendant's counsel]:   Could you explain just briefly what those areas mean?

"Dr. Kolbell:   Sure. Neuropsychology deals with the relationship between how the brain tissue works and how that influences thinking, feeling, and acting. Forensic psychology is the aspect of psychology that provides information based on our science to courts in civil and criminal fields.

"[Defendant's counsel]:   Do you do clinical work with patients?

"Dr. Kolbell:   Oh, yes.

"[Defendant's counsel]:   Do you see them and conduct tests with patients as part of your practice?

"Dr. Kolbell:   Virtually every day.

"[Defendant's counsel]: And do you rely on various scientific—do you rely on various testing to determine what issues you need to follow up on with your patients?

"Dr. Kolbell: Yes, I do.

"[Defendant's counsel]: *Are those tests administered in a fashion to become diagnostic tools to assist you?*

"Dr. Kolbell: *Yes.*

"[Defendant's counsel]: Okay. *And are the tests that you use in your practice those which are generally accepted in your field of practice?*

"Dr. Kolbell: *Yes.*

"[Defendant's counsel]: Did you prepare for me a copy of your curriculum vitae outlining your education, your work experience, and, let's see, academic appointments, publications and research, papers presented, and your professional affiliations?

"Dr. Kolbell: Yes, I did.

"* * * * *

"[Defendant's counsel]: If I were to ask you, question by question, to expound on your education, your work experience, would you, if you verbally went through that, would you tell us everything that's in this document in terms of as opposed to if we just introduced the document would that—in lieu of your testimony

"Dr. Kolbell: The only thing I could tell you more is much greater detail than I think anybody wants to know about what's in there. But yes, yeah, that accurately reflects my education, experience, and training."

(Emphasis added.)

Kolbell's testimony regarding the use of the Gudjonsson Suggestibility Scale in his field of expertise addresses the third *Brown* factor. As to the fourth *Brown* factor (the test's potential rate of error), Kolbell testified that the test had a potential rate of error that is "known or at least communicated" within his field. Kolbell's general testimony about each of the tests he administered to defendant also

included a discussion of the existence of specialized literature. Regarding the fifth *Brown* factor, he testified, in particular,

"[Defendant's counsel]: With respect to each of the eight tests, are you familiar with the existence of specialized literature regarding each of the tests concerning the tests themselves, administration, validity, and so forth?

"Dr. Kolbell: Yes.

"[Defendant's counsel]: Does that specialized literature include such things as peer review?

"Dr. Kolbell: Yes.

"[Defendant's counsèl]: Studies that compare and contrast the validity of individual tests?

"Dr. Kolbell: Yes.

"[Defendant's counsel]: How to improve the test-making technique or interpretive techniques?

"Dr. Kolbell: Yes.

"[Defendant's counsel]: And have you kept yourself current with the literature on these tests over the years while you've been licensed?

"Dr. Kolbell: Yes.

"[Defendant's counsel]: And is that a requirement for being licensed to work in your field?

"Dr. Kolbell: Yes."

Kolbell's testimony also addressed the sixth *Brown* factor regarding the novelty of the Gudjonsson Suggestibility test, and he testified as to the seventh *Brown* factor (the extent to which the test turns on the subjective interpretation of the examiner). His testimony was as follows:

"[Defendant's counsel]: And are there safeguards in either administering or interpreting the tests as to each of them to safeguard against potential error?

"Dr. Kolbell: Yes. I mean, there's—there's a number of safeguards, including the standardization of the administration, the specificity of the scoring practices, the interpretive possibilities provided by the test publisher. Those are

formal structures in place. There's also the structure of licensure that's dependent on training that validates an individual's ability to make appropriate use of the tests and interpret the scores appropriately. So with—with any kind of instrument, with a thermometer, there's going to be a margin of error. With a ruler there's going to be a margin of error. As—and there will be a margin of error with each one of these tests. But that's spelled out in their literature."

At trial, the state offered no witnesses to challenge the validity of the Gudjonsson Suggestibility Scale, nor did it argue that Kolbell had misapplied it when reaching his conclusion as to defendant. Thus, we must determine whether Kolbell's testimony constituted a *prima facie* demonstration of admissibility. We are mindful that no one factor is the *sine qua non* for admissibility or constitutes the dispositive consideration in assessing the scientific validity of a particular methodology on which an opinion is based. Once the threshold for admissibility is met, the validity of some scientific propositions necessarily go to the weight to be given to the evidence by the trier of fact. *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 307-09, 14 P3d 596 (2000). We conclude that Kolbell's testimony meets the threshold for admissibility. It would have been probative, relevant, and helpful to the trier of fact. Based on the record before it, the trial court would have erred if it had excluded the evidence on the basis of a lack of scientific reliability.

Alternatively, the state argues that we must affirm because the trial court's exclusion of Kolbell's testimony, if error, was harmless.[4] The Supreme Court recently clarified in *State v. Davis*, 336 Or 19, 77 P3d 1111 (2003) the standard we must apply to determine whether the exclusion of testimony affected a criminal defendant's substantial rights:

"Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered,

---

[4] The other alternative grounds that the state raises for affirmance were not raised below, and defendant has had no opportunity to create a record regarding them in the trial court. *Outdoor Media Dimensions Inc.*, 331 Or at 660. We therefore decline to consider them for the first time on appeal.

not whether this court, sitting as a fact-finder, would regard the evidence of guilt as substantial and compelling."

*Id.* at 32.

The state, in its closing argument, relied heavily on defendant's taped confession.

"Now, what is the best evidence that any of us have of what happened in that time period? The tape. The tape gives us a window to what happened that doesn't rely exclusively on what anybody said, because it is what we hear. And I would submit to you that the tape is consistent with the police account of what happened.

"* * * * *

"I submit to you * * * that it is unreasonable to suspect that if defendant had been put through the severe torture that was described by them, that you would not hear a trace of that in what she says."

Defendant, on the other hand, sought to demonstrate to the jury with Kolbell's testimony that people with her psychological profile sometimes make statements that appear to be voluntary but that are in fact the product of suggestion. Kolbell's testimony thus went to the heart of her defense that her confession was involuntary and that her son had slapped the child. Given that the voluntariness of defendant's statement may have been essential to the jury's verdict, we cannot say that there is little likelihood that the exclusion of Kolbell's testimony affected the jury's verdict.

On remand, the trial court should address the admissibility of the evidence regarding the other psychological tests in light of this decision.

Reversed and remanded for a new trial.