Argued and submitted May 29, 2015, affirmed March 8, petition for review denied August 24, 2017 (361 Or 803)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JARED MICHAEL CLARK,
*Defendant-Appellant.*

Curry County Circuit Court
12CR0993; A154793

392 P3d 337

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Peensh H. Shah, Assistant Attorney General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

## ORTEGA, P. J.

Defendant appeals his judgment of conviction of two counts of first-degree sodomy, ORS 163.405, and four counts of first-degree sexual abuse, ORS 163.427. He raises three assignments of error, all of which concern the trial court's exclusion of portions of testimony from defendant's expert witness, a neuropsychologist, who testified about what he believed to be the flaws of the investigatory interview of the five-year-old victim and about the developmental mental functions of young children. As to each of defendant's challenges, we conclude that the trial court did not reversibly err, either based on the merits or because defendant did not preserve the error. Accordingly, we affirm.

## I. BACKGROUND

We begin by providing a general background of the relevant facts and procedural history and, to provide context for defendant's challenges, the trial court's rulings regarding what it determined to be admissible expert witness testimony. As to the excluded portions of the neuropsychologist's testimony, we address in turn each ruling and its procedural posture as we discuss defendant's assignments of error.

The five-year-old victim told her father's fiancée that defendant had touched her "privates." The victim was staying with her father in Medford when she reported the abuse but she also lived with her mother in a home in Brookings nearby where defendant lived. When the victim's father learned what she had reported to his fiancée, he questioned the victim about it, and the victim likewise reported that defendant had touched her "privates" but that she had not touched defendant's "privates." In a later conversation, however, the victim acknowledged that she had touched defendant's "privates." The victim's father reported those statements by telephone to Lee, an Oregon State Police (OSP) detective, who then scheduled a forensic interview. Two days later, the victim's father brought her to Grants Pass to be interviewed by Harris, another OSP detective. We need not recount the specific details of the

interview, which was videotaped, but suffice it to say, the victim recounted the abuse which constituted the basis of the charges against defendant and there were some inconsistencies in her account of the abuse. When Lee and Harris later interviewed defendant, he denied the allegations of abuse and sodomy.

Before trial on the six charges on which he was ultimately convicted, defendant indicated that he wanted to present as a witness Dr. Stanulis, a neuropsychologist and forensic psychologist. In a letter report, Stanulis wrote that he had reviewed the videotaped interview of the victim and other investigation materials. Stanulis noted that the case lacked physical evidence of abuse or third party witnesses to the abuse and that he believed that "[e]vidence in a case like this is in the form of memory." Further, he stated that "the most frequent cause of false allegations is not because of lying, but rather the result of suggestibility which can produce false confabulated * * * 'memory' of abuse" and that he would "testify to how 5 year old brains are immature and that memory function at this age is unreliable." In addition to the issue of memory, he wrote, among other things, that "5 year olds are also prone to fantasize and not know the difference between real and make-believe." In support of his proposition that young children have inaccurate recall, he cited an unnamed study which indicated that "in five year olds the accuracy of their recall for events is poor (about a third of an event is recalled accurately while 2/3 is inaccurately recalled" and "a significant percentage (7/30) 'recalled' abuse that did not occur during a videotaped interaction with a male." Stanulis also remarked that he would testify to the manner in which the victim had been questioned and "to what extent that methodology is sound or likely to create false memory." Stanulis specifically noted that his testimony would be "done without vouching or commenting on credibility."

The state moved for a hearing under OEC 104 to determine the admissibility of Stanulis's testimony under the standards for scientific evidence established by the Supreme Court in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995)

(the *Brown* hearing).[1] The trial court granted the motion and, after the close of the state's presentation of its evidence, it conducted the requested *Brown* hearing. During the hearing, Stanulis explained much of what he had set out in his report, and the trial court ruled that certain parts of what Stanulis had intended to testify about were not admissible, which we discuss later. The court, however, allowed the following as scientific evidence:

- About the interview, the court ruled that defendant could "inquire [of Stanulis] as to what the guidelines say.[2] [Defendant] can inquire as to what [Stanulis] sees was done here, that in his view should have been done differently" and that "in the interview process, as you have, the guidelines require the interviewer to look at other possibilities or [an alternative explanation for why a child alleged abuse]."

- The court allowed that Stanulis "may testify that children sometimes might not remember events correctly, that they might confabulate, and that they might fantasize, and that they might tell a story that sounds plausible, even though it is—even though there might be some incorrect information or something along those lines."

- The court ruled that Stanulis could testify that "five year olds are prone to fantasize and not know the difference between real and make-believe."

- The court allowed this statement from Stanulis's report— "[I]n spite of poor accuracy, [five-year-olds] can and do relate plausible events that may appear accurate when, in fact, the recall is very poor." The court warned, however, that "care must be taken to not suggest or imply that that's a reference to this specific case or this specific

---

[1] OEC 104(1) provides:

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges."

[2] The guidelines referred to by the trial court and discussed by Stanulis are the *Oregon Interviewing Guidelines*, an Oregon Department of Justice publication. The purpose of the guidelines is to provide a "general framework for how to go about conducting a child forensic interview in Oregon" and to "promote consistency in the quality of care provided to those Oregon children who are interviewed for possible abuse." *Oregon Interviewing Guidelines* 3-4 (3rd ed 2012).

witness" and, as a general proposition, "[Stanulis] can testify that there have been instances where children have recalled abuse which did not occur."

- The court permitted Stanulis to opine that there "is an alternative explanation for the child witnesses—or there can be alternative explanations for children who allege sexual abuse. He's not going to say in this case there's an alternative explanation, but just that in general there can be, and that's a legitimate subject for an expert who's a psychologist to testify about."

At trial, the state played the video of the victim's forensic interview and, afterwards, the victim testified. Then six years old, she recalled that she lived in Brookings for a period of time and indicated that she recognized defendant and that he had lived in the Brookings house. Although she remembered being interviewed by Harris, she neither recalled any of the abuse nor remembered making any of the statements she had made in the forensic interview. When asked if she told Harris the truth, she replied that she had. Defendant testified, again denying that he had abused the victim. Stanulis testified, although to much less than he had at the *Brown* hearing. Several times during his testimony, the trial court ruled that Stanulis's statements were inadmissible; defendant challenges on appeal some of those rulings and some of the rulings made during the *Brown* hearing.

## II.  LEGAL FRAMEWORK FOR SCIENTIFIC EVIDENCE

Scientific testimony is admissible if it is (1) relevant under OEC 401; (2) of some assistance to the trier of fact under OEC 702; and (3) under OEC 403, its probative value is not outweighed by the danger of unfair prejudice or jury confusion.[3] Applying those evidentiary rules, the

---

[3]  OEC 401 provides:

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness

court determines "'whether scientific evidence is probative under OEC 401'" and conducts the "'relevancy and prejudice analysis implicated in OEC 702's helpfulness standard[.]'" *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 302, 14 P3d 596 (2000) (quoting *Brown*, 297 Or at 417); *see also Brown*, 297 Or at 409 (a court must "identify and evaluate the probative value of the evidence, consider how it might impair rather than help the factfinder, and decide whether truthfinding is better served by exclusion or admission"). The court considers a number of factors as guidelines when determining the relevance or probative value of proffered scientific evidence under OEC 401 and OEC 702.[4] *O'Key*, 321 Or at 303-04; *Brown*, 297 Or at 417. The "overarching subject of this multifactor, flexible inquiry is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission[.]"[5] *O'Key*, 321 Or at 305 (internal quotation marks omitted).

---

qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[4] The *Brown* factors are:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

*Brown*, 297 Or at 417.

In *O'Key*, the court supplemented the *Brown* analysis with four more factors: (1) "whether the theory or technique in question can be (and has been) tested"; (2) "whether the theory or technique has been subject to peer review and publication"; (3) "the known or potential rate of error and the existence of operational standards controlling the technique's operation"; and (4) "the degree of acceptance in the relevant scientific community." 321 Or at 303-04 (internal quotation marks omitted).

[5] We note that there is no dispute that Stanulis's testimony was scientific evidence and that Stanulis was qualified to give it. *See State v. Marrington*, 335 Or 555, 561, 73 P3d 911 (2003) ("[E]xpert testimony concerning matters within the sphere of the behavioral sciences possesses the increased potential to influence

It is the burden of the party offering the scientific evidence—here, defendant—to establish that the evidence is scientifically valid. *State v. Perry*, 347 Or 110, 122, 218 P3d 95 (2009). "That is, the party offering the scientific evidence must establish that the evidence 'possesses sufficient indicia of scientific validity to be helpful to the jury under OEC 702.'" *State v. Dulfu*, 282 Or App 209, 218, 386 P3d 85, 91 (2016) (quoting *State v. Sanchez-Alfonso*, 352 Or 790, 801, 293 P3d 1011 (2012)).

Also implicated in the trial court's rulings is the prohibition against commenting on the credibility of a witness. That is, a witness is prohibited from commenting directly on whether another witness is testifying truthfully or whether another witness's prior statement was truthful. *State v. Keller*, 315 Or 273, 284-85, 844 P2d 195 (1993); *State v. Middleton*, 294 Or 427, 437-38, 657 P2d 1215 (1983). However, the "jury's function is not impinged upon when expert testimony does no more than provide jurors with useful, nonconclusive information from which *inferences* as to credibility *may* be drawn." *State v. Remme*, 173 Or App 546, 562, 23 P3d 374 (2001) (observing that it was permissible to allow a witness to provide the jury with possible reasons for the victim's behavior) (emphases in original). With that legal framework in mind, we turn to defendant's claims of error in which he contends that the trial court erred in excluding certain portions of Stanulis's testimony or proposed testimony.

## III. ANALYSIS

A. *"Confusion between fantasy and reality"*

Defendant's first assignment of error challenges the court's ruling which sustained the state's objection to Stanulis's testimony, italicized as follows, during the trial:

---

the trier of fact as scientific assertions, just as expert testimony dealing with the 'hard' sciences does."); *see State v. Rogers*, 330 Or 282, 316, 4 P3d 1261 (2000) (a "properly qualified clinical psychologist" is not disqualified to provide scientific evidence under OEC 702 despite lack of a medical degree); *State v. Warren*, 224 Or App 204, 212, 197 P3d 605 (2008) (concluding that "Stanulis was unquestionably a 'properly qualified clinical psychologist'" and that his "qualifications included a Ph.D. in clinical psychology, with a specialization in clinical neuropsychology, an area involving the biology of memory as well as the psychology of memory and mental disorders" (quoting *Rogers*, 330 Or at 316)).

"[DEFENDANT]: All right. Doctor, what can you tell us about a five year old's brain and memory?

"[STANULIS]: Well, it's still in the process of maturing, so it still has issues. The memory systems, language systems, still concrete thinking, it's still a relatively immature brain.

"[DEFENDANT]: Okay. The development of that brain at five years old generally, what—what aspects does it have that adult—what aspects does it not have that an adult might have generally?

"[STATE]: Objection, Your Honor.

"THE COURT: Overruled.

"[STANULIS]: *Okay. A child's brain, the memory systems are still developing. You see concrete thinking. You see suggestibility. You see confusion between fantasy and reality.*

"[STATE]: Objection.

"THE COURT: Stop. Sustained.

"[DEFENDANT]: Yes, Your Honor."

(Emphasis added.)

In defendant's view, it was error for the court to exclude Stanulis's opinion that a child's memory systems are still developing and that children exhibit concrete thinking, suggestability, and confusion between fantasy and reality because those opinions are scientifically valid. The state responds by asserting that defendant misreads the court's ruling. In the state's view, the ruling is much narrower when viewed in context. That is, the state asserts that Stanulis's answer was drifting toward being nonresponsive. The state points out that, several times during the *Brown* hearing, the court admonished Stanulis for making conclusory statements and failing to make sure that his words "mean what [he is] trying to say."[6]

---

[6] For example, when Stanulis testified that if an interviewer repeats a question, the interviewer is communicating that he or she did not like the answer, and that children "will change their answer to meet *** what they think the interviewer wants." The court stopped Stanulis and admonished him for saying that children "will" change their answer, explaining that the "words you use *** particularly in a courtroom setting, are very important, *** and so I want you to watch the words you use."

Thus, the state posits that the court was making a ruling regarding the conclusory nature of Stanulis's statement that, in children, "You see confusion between fantasy and reality." We agree with the state for several reasons. First, the state objected immediately after that statement. *Cf. State v. Stevens*, 328 Or 116, 138, 970 P2d 215 (1998) ("Timeliness, in this context, as in almost any context in which the admissibility of evidence is at issue, means at or before the time that the evidence is offered to the jury."). Second, the court had forewarned Stanulis about drifting into absolutes, and Stanulis statement that children exhibit "confusion between fantasy and reality" can be fairly understood as a conclusory statement of the kind that Stanulis had been admonished to avoid. Third, the trial court previously had permitted Stanulis to testify that "five year olds are *prone* to fantasize and not know the difference between real and make-believe."

In context, we understand the court to have ruled that Stanulis's statement—stating in a conclusory fashion without qualification that children confuse reality and fantasy—exceeded the scope of permissible opinion testimony. Defendant neither challenged the scope of the court's ruling at the *Brown* hearing that Stanulis could testify that children are *prone* to confusing the difference between real and make-believe nor contested the trial court's admonitions that Stanulis could not opine in absolute terms. Further,

Elsewhere, during the *Brown* hearing, the court stated:

"All right. One other matter, Dr. Stanulis yesterday appeared to have a tendency to continue talking or talk about matters that were nonresponsive in relation to the questions that he was asked. He should be instructed, [defense counsel], that he may respond to questions with responsive answers. He may not offer additional information that is not responsive to the questions. In other words, listen to the question and answer the questions specifically and then wait for another question.

"I also don't want him to attempt to advocate or be the lawyer from the witness stand. If he, in front of the jury is doing these things, he will be interrupted by me, and I'm going to attempt to prevent that from occurring, which won't be difficult, but I'm going to attempt to do that, and this should serve as a warning that will come, and I will not be pleased if I see that there appears to be some intentional attempt to get around this instruction from the Court."

The court further cautioned Stanulis

"to not use language which doesn't communicate exactly what he's trying to communicate. So absolutes probably aren't what you intend generally, and so if you don't intend an absolute, don't use an absolute."

defendant did not seek to clarify the court's ruling by pointing out that the court had ruled previously that Stanulis was allowed to testify to some extent about children's ability to distinguish reality from fantasy. Accordingly, the trial court did not err.

B.  *"Reliable"*

In defendant's second assignment of error, he asserts that the court erred when it excluded Stanulis's testimony regarding the victim's interview, specifically, about the possible consequences of the manner in which the questioning was conducted, and the failure to develop background information to establish the victim's developmental level and familiarity with sexual terminology. At the *Brown* hearing, in response to questions about the deficiencies of the interview, Stanulis testified that, in a typical CARES interview,[7] and in accordance with the *Oregon Interview Guidelines*, the interviewer asks the child's parents questions about how the child is doing at school, where the child is developmentally, whether there are psychiatric problems, the child's understanding of what body parts are called and how the child describes such concepts as "in," "out," "on top," or "in between." In Stanulis's opinion, those questions are ordinarily asked in order to ensure that the child is at a "good developmental level" and that "there's not a language problem" that might interfere with the child's ability to understand the interviewer's questions. Stanulis also noted that, in the actual interview of the victim, he had concerns about the victim's ability to understand Harris's questions, pointing to one point in the interview when the victim answered "Blue" when asked about the color of Harris's house, even though she had no way of knowing the answer to that question, and another point where there was confusion on the victim's part about her age.

When asked what Harris was attempting to do in asking those questions in the forensic interview of the victim, Stanulis responded:

---

[7] CARES is a regional child abuse assessment center for the northern region of the state. The acronym CARES stands for "Child Abuse Response and Evaluation Services."

"What obviously she's—[Harris] has information in the first three or four pages that this child is not understanding what she's trying to teach. So you go back to what—the original first part of what you're doing in the interview is an assessment of the child's development, so this means you have to do more assessment before you go off and see what is the problem here. Is this a child who's just too young and there isn't a fix, or is it how I'm answering the—asking the questions? So it requires further assessment of how come I'm not teaching the child. Is it me asking the questions, that I'm not getting how concrete this child is at this age? Is it that this child—I don't still have enough handle on it. I haven't done a good enough job yet of understanding the language development and the developmental level of this child.

"[DEFENDANT]: All right. Does this then—I think you testified, does it create problems further in the interview then?

"[STANULIS]: Well, yes, because you haven't established if this child is reliable, okay, is competent, is able to answer your questions, and whether that's a function of the interviewer or you're just asking the child to do something beyond their developmental level, that's what you have to assess before you move on into important stuff.

"[DEFENDANT]: And so that assessment needs to be done under the guidelines?

"[STANULIS]: Yes.

"[DEFENDANT]: Okay. Go on to the next issue you see about the techniques of questioning.

"THE COURT: Hold on. While we're on this subject, let's make sure that I don't forget. *The doctor just testified that it has not been established that the child is reliable. That crosses the line into a comment on the credibility of the child.*

"* * * * *

"THE COURT: Again, *the comment from the doctor that it has not been established that the child is reliable crosses the line into a comment on the child's credibility, and that will not be permitted.*

"[DEFENDANT]: Yes, sir."

(Emphases added.)

In addition to that ruling during the *Brown* hearing, defendant asserts that that the court "broadly applied" that ruling when, before the jury, defendant asked Stanulis whether he had any concerns about the interview, specifically, whether the victim "is able to distinguish between—about truth." The court sustained the state's objection, explaining that Stanulis was not allowed to "testify about the credibility of the child witness. He can't offer an opinion about whether the child is credible or not or not remember something or not. That's purely within the province of the jury." In response, defendant withdrew his question.

Defendant asserts on appeal that Stanulis's opinion that it is the best practice for an interviewer to assess whether the interviewee can reliably answer questions is not a comment on credibility. Rather, citing *Remme* and *State v. Romero,* 191 Or App 164, 81 P3d 714 (2003), *rev den,* 337 Or 248 (2004), defendant argues that Stanulis's concern about Harris's failure to establish the reliability of the victim's answers to Harris's questions was admissible evidence that the jury could have used to draw inferences about the victim's credibility.

In *Remme,* we considered the admissibility of several witness statements that offered possible explanations for why a child abuse victim gave inconsistent reports of the abuse. 173 Or App at 562. As noted, in view of Supreme Court case law, we held that

> "expert testimony must assist, not supplant, the jury's assessment of credibility. The jury's function is not impinged upon when expert testimony does no more than provide jurors with useful, nonconclusive information from which *inferences* as to credibility *may* be drawn."

*Id.* (citing *Middleton, State v. Milbradt,* 305 Or 621, 756 P2d 620 (1988), and *Keller*) (emphases in original). Likewise, in *Romero,* the defendant challenged her confession on the basis that the confession was involuntarily made, and sought to introduce evidence from a psychologist that she was more susceptible to suggestion in a police interrogation setting than an average person would be, based on tests that he had administered to her. 191 Or App at 167. The psychologist

was prepared to testify that the defendant was inclined to change her answers when challenged and was influenced by leading questions. We reversed the trial court's exclusion of that evidence, which had rested on the court's conclusion that the evidence would have impermissibly commented on the truthfulness of the defendant's testimony. Citing *Remme,* we concluded that "nothing in [the psychologist's] testimony * * * comments directly on defendant's credibility." *Id.* at 171. "None of that testimony would have supplanted the jury's assessment of credibility; rather, it simply would have provided the jury with information or reasons from which it could draw inferences as to credibility regarding defendant's claims that her confession was false." *Id.*

Defendant argues that the trial court in this case made the same error that the trial courts did in *Remme* and *Romero* when it ruled that Stanulis could not use the term "reliable" in reference to the preliminary steps ordinarily taken in a forensic interview concerning alleged child abuse. That argument, however, was never raised below. Although the state does not contend that defendant failed to preserve that argument, we are nonetheless obligated to determine if an argument is preserved. *State v. Wyatt,* 331 Or 335, 345-47, 15 P3d 22 (2000). "[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *Id.* at 343 (concluding that "defendant's *arguments* and offer of proof here did not identify adequately for the judge the issue" raised on appeal (emphasis added)). Here, defendant failed to either clarify to the trial court that Stanulis's opinion was directed to the inadequacy of the interview process or argue that it was "useful, nonconclusory information from which inferences as to credibility may be drawn," rather than a direct comment on whether the victim was being truthful. Accordingly, defendant failed to preserve that argument and it is not properly before us. Similarly, the trial court's ruling that Stanulis's opinion that an interview must establish whether a subject "is able to distinguish between—about truth" was an impermissible comment on the victim's credibility was not met with an argument asserting otherwise.

Further, defendant withdrew that evidence. Under these circumstances, defendant did not preserve the error he now asserts.

## C. *Scientific Studies*

As to defendant's third assignment of error, he asserts generally that the trial court erred when it precluded Stanulis from discussing the results of two categories of studies which supported his opinions—that is, statistical evidence and studies that were addressed in the Supreme Court's *Lawson/James* opinion.

### 1. *Statistical evidence*

Stanulis set out in his letter that he intended to testify that "[r]esearch has indicated that in 5 year olds the accuracy of their recall for events is poor (about a third of an event is recalled accurately while 2/3 is inaccurately recalled) and that in that same study a significant percentage (7/30) 'recalled' abuse that did not occur during a videotaped interaction with a male." At the *Brown* hearing, Stanulis described this research as coming from the "Rawls study," a copy of which he provided to the state. During his description of the study, the court ruled that it would not allow Stanulis to discuss statistics. The next day, the state challenged the methodology of the study and asserted that it was neither published nor peer reviewed. When the court stated that the study would not be admitted unless defendant could show that it was peer reviewed or published, defendant responded that he could not make that showing and offered to withdraw the study. The trial court then ruled that it would not allow Stanulis to "start talking about percentages of credibility or rates at which children witnesses are credible or not credible or rates of confabulation based upon certain studies," and that it was the court's "understanding that the courts have said that that's generally not permissible, it's not useful to the jury and, in fact, could be misleading and prejudicial." Relatedly, referring to the letter in which Stanulis set out his proposed testimony, the court ruled that it would not allow Stanulis to use the term "significant percentage" with regard to children recalling abuse that did not occur.

On appeal, defendant acknowledges that the Rawls study was "withdrawn" and does not assign error to the trial court's exclusion of that evidence; rather, he challenges the trial court's "categorical" ruling precluding Stanulis from mentioning percentages or statistics.[8] The state responds that defendant's argument is not preserved because he failed to make an offer of proof as to any of the studies on which he would rely to provide percentages or statistics. Indeed, defendant has not pointed to where in the record defendant made an offer of proof as to any other statistical evidence Stanulis would have provided that he now asserts was error to exclude. Nor does defendant on appeal point to any study or literature in the record, apart from the withdrawn Rawls study, providing statistics that Stanulis was prevented from discussing. We agree with the state that defendant did not preserve his challenge because he failed to make an offer of proof as to any other statistical evidence Stanulis would have presented to the court for which now asserts he was incorrectly excluded.

A party "ordinarily must make an offer of proof as to the content of the excluded evidence" to preserve a challenge to the exclusion of that evidence. *State v. Olmstead*, 310 Or 455, 459-60, 800 P2d 277 (1990); *see* OEC 103(1)(b) (a party can assign error to a trial court's excluding of evidence if "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked"). In the absence of an offer of proof, the error can be preserved "if '[t]he questions asked and the arguments presented to the court on the issue were adequate to inform the trial court of the substance of the evidence and its error in excluding it.'" *State v. Lasky*, 259 Or App 307, 315, 314 P3d 304 (2013) (quoting *Schacher v. Dunne*, 109 Or App 607, 610, 820 P2d 865 (1991), *rev den*,

---

[8] On appeal, the state asserts that "statistical evidence is precisely the sort of evidence that can unfairly influence a factfinder," but offers no case law to support the trial court's categorical exclusion of statistical evidence. Indeed, our case law indicates that there is no such categorical rule that excludes statistical evidence as unduly prejudicial under OEC 403. *See, e.g., State v. Futch*, 123 Or App 176, 190, 860 P2d 264 (1993), *aff'd*, 324 Or 297, 924 P2d 832 (1996) (statistical evidence for DNA testing was not unduly prejudicial and, thus, admissible); *Plemel v. Walter*, 303 Or 262, 735 P2d 1209 (1987) (setting out how statistical evidence and probabilities should be presented in paternity disputes).

313 Or 74 (1992)). "The purpose of the rule requiring an offer of proof to preserve a claim of error when a trial court excludes testimony is 'to assure that appellate courts are able to determine whether it was error to exclude the evidence and whether any error was likely to have affected the result of the case.'" *State v. Morgan*, 251 Or App 99, 105, 284 P3d 496 (2012) (quoting *State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988)). Here, without an offer of proof, any statistical evidence that Stanulis would have testified to in support of his conclusions is merely hypothetical and, thus, there is no way for us to determine whether such statistical evidence or use of percentages is scientifically valid. And, although the trial court's ruling precluded Stanulis from testifying about statistical evidence from other studies, it did not prohibit defendant from making an offer of proof or describing or identifying other studies to which Stanulis would testify.

2. Lawson/James *studies*

Also included in defendant's assignment of error is what he characterizes as the trial court's exclusion of any of the studies cited in *State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012). In the *Brown* hearing, Stanulis referenced a study identified in the appendix to *Lawson/James* to support his proposition that memory is malleable and that eyewitnesses to crimes are susceptible to suggestion depending on the type of question asked. He opined, in part:

> "[A]nother Elizabeth Loftus study is the study of having people look at an automobile crash on video and then asking how fast were the cars going when they hit, how fast were they going [when they were] smashed. The exact [citation] is in *Lawson* in the [appendix], if you want to look it up. But it's—And you'll get reliably higher speed estimates using the word—by changing the word—by changing one word.
>
> "That obviously has implications for (unintelligible) of fact, but if you were speeding or not, and I guess, you know, 10 miles an hour is significant, because I saw you doing 30 in 25, I think a jury, that has—people might think but 40, that's a significant difference. And then in that same experiment ask where was the broken glass when, in fact, there was none, a confabulated memory with the word 'smashed,' not, 'hit.'

"*****

"And, you know, it's when we get into the other ones that we can script, like eyewitness identification. How you ask that question is extremely important, and this is all the same research underlying these three areas of eyewitness identification, false confessions, interview tactics with children, okay? And it's just simply pointing out that memory is quite malleable, and you can change it unwittingly. You don't have to think, you know, the word 'smash,' for example. I can easily see somebody, 'Wow. That's awful. They smashed into you. How fast were they going?'"

After the trial court questioned Stanulis about whether the study related to confabulation rather than variation in a story, Stanulis moved on to discussing the Rawls study. Later in the hearing, the court ruled that

"[Stanulis] is not to provide information about other cases which have occurred in other courts, including the Court of Appeals or Supreme Court, or other cases that he's been involved with and the outcome of those cases. Those matters are not relevant to this proceeding, and I don't want there to be some sort of implication that, because courts have made one decision in some other case, something's wrong with this case.

"[STANULIS]:   So can I just clarify? You don't want me to mention any other *cases*?

"THE COURT:   Correct. *I don't want you to talk about, for instance, the recent case that's come down on identity.*

"[STANULIS]:   Okay.

"THE COURT:   And particularly, you know, talking about *throw-downs and line-ups* and that sort of thing. It's not relevant to this proceeding, but also there's no reason for this witness to start providing any sort of legal analysis to the jury—

"[DEFENDANT]:   Correct, Your Honor.

"THE COURT:   —or to apply the facts in this case or any other case to the law. That is not something that's appropriate for this expert witness to do."

(Emphases added.)

We understand the trial court to have prevented Stanulis from discussing appellate decisions, applying legal analysis to the facts of this case or another case, and mentioning eyewitness identification procedures. However, we do not agree with defendant that the court categorically prohibited Stanulis from discussing any of the studies cited in *Lawson/James*. Not all of the studies cited in *Lawson/James* concerned eyewitness *identification*. Indeed, the Loftus study referenced by Stanulis was identified by the *Lawson/James* court in its summary of the scientific research and literature it examined to arrive at what it called "system variables"[9] and under the particular subheading "Suggestive Questioning, Cowitness Contamination, and Other Sources of Post-Event Memory Contamination." 352 Or at 786-88. The referenced studies were cited for the proposition that "[w]itness memory * * * can become contaminated by external information or assumptions embedded in questions or otherwise communicated to the witness." *Id.* at 787. That study was not directed to eyewitness identification specifically but, rather, to the more general proposition that the circumstances "in which eyewitnesses are questioned or converse about an event can alter their memory of the event." *Id.* at 786. Moreover, the study supported the issue that Stanulis indicated concerned him about Harris's interview of the victim: The manner of Harris's questioning of the victim could have elicited inaccurate responses. Stanulis could have relied on the study, and the other studies in that subsection of the *Lawson/James* appendix, without running afoul of the trial court's ruling. That defendant may have understood at trial, or understands on appeal, the ruling to be broader so as to include a categorical exclusion of any and all studies cited in *Lawson/James* is of no moment. Our task is to correct any erroneous ruling made by the trial court, and, in this instance, the court did not err.

Affirmed.

---

[9] "System variables refer to the circumstances surrounding the identification procedure itself that are generally within the control of those administering the procedure." *Lawson/James*, 352 Or at 740.